IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICK W. DINAN,
       Plaintiff,

                                          3:12-cv-00615-PK

                                          OPINION AND
v.                                      ORDER

MULTNOMAH COUNTY and JASON
VETTER,
       Defendants.

PAPAK, Magistrate Judge:

       Plaintiff Patrick Dinan brings this civil rights action against defendants Multnomah

County and Multnomah County Sheriff's deputy Jason Vetter arising out of a confrontation

between Dinan and Vetter inside the Multnomah County Courthouse.  Dinan alleges claims

under 42 U.S.C. § 1983 for unreasonable seizure and excessive use of force in violation of the

Fourth Amendment, under § 1983 for retaliation for conduct protected by the First Amendment,

as well as common law torts of assault and battery, and false imprisonment.  (Fourth Amend.

Compl., #29.)  Now before the court are defendants' motion for summary judgment on all of

plaintiff's claims (#32) and plaintiff's motion for partial summary judgment on his § 1983 Fourth

OPINION AND ORDER- Page 1

Amendment claim against defendant Vetter and against both defendants' on their qualified immunity affirmative defenses (#43.)  For the reasons discussed below, both parties' motions are granted in part and denied in part.

## BACKGROUND

This case focuses on events that took place during the afternoon of September 30, 2009 inside the Multnomah County Courthouse.  Dinan, who was 64 years old at the time, came to the courthouse concerning a pending case related to a traffic citation for having an expired vehicle registration.  (Walch Decl., #45, Ex. E, at 49:10-13) ("Dinan Dep."); (Dinan Decl., #51, ¶16.)  Judge *pro tem* Christopher Larsen had previously presided over a court trial in that case on August 12, 2009 and taken the case under advisement.   (Dinan Dep. at 49:14-19); (Jones Decl., #34, Ex. 2, at 3); (Larsen Decl., #38, ¶2.)  According to Larsen, Dinan was "very argumentative and aggressive" during the trial, and Larsen had to admonish him several times to remain calm. *Id.* at ¶3.

In any event, on September 30, 2009 Dinan came to the courthouse to file a motion for a temporary injunction to prevent law enforcement from citing him for having an unregistered vehicle while Judge Larsen was still drafting his ruling.  (Dinan Dep., at 51:4 - 52:18; 57:2-22); (Jones Decl., Ex. 2 at 3.)  After entering the courthouse, Dinan went directly to Room 106, the clerk's office, and filed the motion for the temporary injunction.  (Dinan Dep., at 57:19-20.)  Because Dinan had some extra time, he went to Judge Larsen's courtroom – Room 124– to ask the judge when he would issue a written decision, since almost 60 days had passed since Dinan's trial.  (Dinan Dep., at 48:16-23, 50:22-51: 3; 57:3-22.)

A video recording of Judge Larsen's courtroom that afternoon shows Dinan sitting in the

second row and waiting for Judge Larsen to finish traffic court. (Vetter Decl., #41, Ex. 3) (Courtroom Video). Either Judge Larsen or his courtroom clerk, Vanessa DeJesus, had requested a Sheriff's deputy come to the courtroom after Dinan arrived because of concerns about Dinan's previous behavior. (Larsen Decl., #38, ¶6); (DeJesus Decl., #36, ¶4.) Consequently, Deputy Vetter, an on-duty Court Services Section (CSS) deputy, sat in the rear of the courtroom while Judge Larsen conducted the traffic court docket.[1] (Courtroom Video at 0:00); (Vetter Decl., #41, ¶7); (Walch Decl., #45, Ex. C, at 24:10-16) (Vetter Dep.).

   As Judge Larsen finished his traffic calendar, Dinan stood up, walked towards the bench holding some papers, and stopped at the side bar. (Courtroom Video at 1:12-18); (Vetter Decl., ¶8.) As he approached the bench, Dinan began speaking to Judge Larsen in a normal tone of voice. (Larsen Decl., ¶7); (DeJesus Decl., ¶¶5-6). Dinan apparently wanted to give the papers he was holding directly to Judge Larsen. (DeJesus Decl., ¶5.) An audio recording from the courtroom indicates that Judge Larsen told Dinan that he had a case under advisement with Dinan as a defendant, that Dinan had no case on the docket that day, and that since no opposing counsel was present, it would be improper *ex parte* contact for him to talk with Dinan. (Vetter Decl., Ex. 4, at 2:49:25-44) (Courtroom Audio) After Judge Larsen told Dinan that he would not talk to him, Dinan seemed to become more frustrated, using what Judge Larsen and Vetter

---

[1] Vetter offers slightly conflicting accounts of whether he was aware of Dinan's history of disruptiveness when Vetter arrived at Room 124. *Compare* (Vetter Dep. at 36:12-19) (Vetter was told that Dinan was in the courtroom and could potentially be disruptive, but Vetter did not know who Dinan was) *with* (Vetter Decl., ¶7) (although Vetter had not had contact with Dinan before, he knew Dinan's name and that Dinan had been disruptive to court staff and security in the past).

OPINION AND ORDER- Page 3

describe as an agitated, argumentative, and aggressive tone of voice.[2] (Larsen Decl., ¶8); (DeJesus Decl., ¶7); (Vetter Decl., ¶8.) At that point Dinan can be heard on the audio recording saying, "How does one do it, Your Honor? When will I expect to get it then?" and then in a slightly lower tone of voice, "Jesus." (Courtroom Audio, at 2:49:45-53.) Around the same time, Judge Larsen stood up and left the bench, noting that Dinan was clearly frustrated, angry, and "being aggressive." (Courtroom Video, at 1:30-32); (Larsen Decl., ¶9.) The clerk told Dinan that court was over and she would have to lock up the courtroom. (Courtroom Audio, at 2:49:53 -55.) The audio ends there, but the clerk also states that Dinan argued with her for several more seconds, which Dinan denies. (DeJesus Decl., ¶7); (Dinan Decl., #51, ¶3.) Meanwhile, Vetter remained seated in the rear of the courtroom. (Courtroom Video, at 1:32.)

As Dinan turned away from the clerk's desk and walked toward the rear of the courtroom, Vetter rose from his seat and stood near the door out of the courtroom. (Courtroom Video, at 1:35.) Dinan returned to the second row of the gallery, put on his hat and jacket, and retrieved his papers. (Courtroom Video, at 1:36 -44.) While putting on his coat, Dinan said something to Vetter in what Vetter described as an upset tone of voice. (Vetter Decl., ¶9.) Because Vetter perceived Dinan's behavior to be disruptive towards court staff and Judge Larsen, because Dinan's voice and body language showed he was still upset, and because Dinan "had no more business with the court that day," Vetter determined that Dinan "needed to leave the courthouse for the day because of his behavior." *Id.* Dinan walked towards the courtroom door, and paused near Vetter as another CSS deputy, Deputy Perkins opened the courtroom door from the outside

---

[2] Dinan admits that he raised his voice, but only because Judge Larsen was talking over him. (Dinan Decl., ¶10.) Out of respect for the Judge and his staff, Dinan stayed to the side of the bar separating the gallery from the bench. *Id.*

OPINION AND ORDER- Page 4

and told Dinan he needed to leave. (Courtroom Video, at 1:45) (Perkins Decl., #39, ¶¶6-7.)

Vetter put his right hand on Dinan's left shoulder, and they appeared to engage in conversation

for a few seconds. *Id.* at 1:46-1:48.

According to Vetter, he told Dinan that Dinan "needed to leave the courthouse, that it was

time for him to leave, and that he was done for the day," using a normal tone of voice and

making it clear that Dinan needed to leave. (Vetter Decl., ¶¶10,11); (Vetter Dep., at 28:1-3);

(DeJesus Decl., ¶8.) Vetter initially testified that he could not recall whether Dinan said anything

in response to Vetter's order to leave, but Vetter later declared that Dinan argued back, saying

that he had a right to be in the building since it was a public facility. (Vetter Dep., at 28:11-14);

(Vetter Decl., ¶¶10,11.) DeJesus and Perkins also indicated that Dinan appeared to be arguing

with Vetter. (DeJesus Decl., ¶8); (Perkins Decl., ¶6.) During this exchange, Dinan and Vetter

remained in front of the door out of the courtroom, and Vetter perceived Dinan's hesitation to be

"some sort of resistance." (Vetter Dep., at 28:4-7); (Courtroom Video, at 1:46-48.)

Dinan offers a different account. Dinan states that neither Vetter nor Perkins told him he

had to leave the courthouse while he and Vetter stood near the door, although Dinan also testified

that he did not have a recollection of exactly what Vetter said. (Dinan Decl., ¶7.); (Dinan Dep.,

at 84:16-22.) Dinan also denies arguing with Vetter at the door of the courtroom and denies

saying that he wanted to stay in the courtroom. (Dinan Decl., ¶5.) Dinan explains that because

Judge Larsen had already left the bench, there was no point for him to stay in the courtroom;

instead, at that point Dinan intended to return to Room 106 and ask the clerk when he could

expect to receive a notice of temporary injunction. *Id.*

After Perkins allegedly told Dinan he needed to leave and gestured with his hand for

Dinan to come out of the courtroom, Dinan exited the courtroom with Vetter following behind,

keeping his right hand on Dinan's back. (Courtroom Video, at 1:48-50); (Perkins Decl., ¶7.)

Dinan was not resisting and Vetter was not pushing Dinan. (Vetter Dep., at 19:1-8.) This and the

interaction that follows was captured by video taken in the hallway outside Room 124. (Vetter

Decl., Ex. 3, at 2:16-17) (Hallway Video). Instead of walking to the left, the most direct route to

the courthouse exit, Dinan started to turn to the right.    (Hallway Video, at 2:18.) Dinan said that

he was going to Room 106, where the clerk's filing window is located. (Vetter Dep., at 12:9-17);

(Vetter Decl., ¶14); (Dinan Dep., at 78:5-8.) Dinan's intention at the time was to go to Room

106, ask the clerk when he would receive his notice of temporary injunction, and then leave the

courthouse through the exit that is just on the other side of Room 106. (Dinan Decl., ¶¶5-6.)

As Dinan turned, Vetter, who was still standing behind Dinan, placed his right hand

briefly on Dinan's right shoulder, while Perkins turned squarely to face Dinan and held his right

arm out, blocking the path down the hallway to the right. (Hallway Video, at 2:18.) Dinan

continued pivoting and walking backwards, so that his body faced back towards Vetter, Perkins,

and the door to Room 124. (Hallway Video, at 2:19.) As Dinan turned and retreated, Vetter

dropped his right hand from Dinan's right shoulder and moved it towards Dinan's left shoulder.

(Hallway Video, at 2:19.) Dinan took another step back away from Vetter, and Vetter stepped

toward Dinan, stretching out his arm at shoulder height and placing his right hand on Dinan's left

shoulder. (Hallway Video, at 2:19.) Vetter perceived that Dinan's body was tense. (Vetter

Decl., at ¶16.) Vetter did not grab Dinan or apply an more force than the weight of his hand.

(Vetter Decl., ¶15.) Vetter had the intention of guiding Dinan towards the exit, and as he put his

hand on Dinan's shoulder, Vetter told Dinan that Dinan needed to leave.[3]  (Vetter Decl., ¶¶15-16.)

As Vetter placed his hand on Dinan's shoulder, Dinan stepped back with his left foot and raised his left arm to the inside of Vetter's right arm, pushing Vetter's arm away from Dinan's shoulder.  (Hallway Video, at 2:20.)  According to Vetter, however, Dinan "suddenly raised his left arm up and chopped it down onto my right arm with enough force to knock my arm away from his body." (Vetter Decl., ¶16.)  Perkins likewise stated that Dinan struck Vetter using his left arm "in a chopping motion down on Deputy Vetter's right arm." (Perkins Decl., ¶9.)  After Dinan pushed Vetter's arm off his shoulder, Vetter "perceived active resistance by [Dinan]" and "perceived [Dinan] as an immediate threat, in that he had already struck me once, was still clearly upset, and was within striking distance of me." (Vetter Decl., ¶¶16-17.)  Vetter believed Dinan was a threat to strike him again or grab at items on his belt. *Id.* at ¶17.

Vetter then took a large step towards Dinan, who retreated a step, and pushed Dinan with both hands on Dinan's chest.  (Hallway Video, at 2:20.)   Vetter described this as a "forcefully delivered . . . two-handed shove" to Dinan's chest.  (Vetter Decl., ¶18.)  Vetter's shove propelled Dinan backwards into a marble door frame and a closed wooden and glass door.  (Hallway Video, at 2:21.)  Dinan's back, neck and head hit the wall.  (Dinan Dep., at 96:3-17.)  Vetter then put both hands on Dinan's chest, grasping Dinan's coat and pulling Dinan away from the doorway, and bringing his face close to Dinan's face.  (Hallway Video, at 2:21-23); (Vetter Decl., ¶18.)  Dinan described this as a "death grip . . . like he was never going to let go" and felt fearful

---

[3] Again, Dinan disputes that Vetter told him he had to leave at this point in the encounter. (Dinan Decl., at ¶7.)

that Vetter was going to kill him.[4]  (Dinan Decl., at 85:1-13.)  Vetter told Dinan that he was not

permitted to strike Vetter again.  (Vetter Decl., ¶18.)  Dinan's feet appeared to slip out briefly

from beneath him.  (Hallway Video, at 2:23.)  Perkins moved to Dinan's left side, placed his

hand on Dinan's upper arm, and directed Dinan to "calm down, to end his hostility, and to get []

moving out of the building."  (Perkins Decl., ¶9.)  As Perkins kept hold of Dinan's left arm,

Vetter moved to Dinan's right side and grabbed Dinan's right arm, which he explained was to

make sure that Dinan would not strike him again.  (Hallway Video, at 2:24); (Vetter Decl., ¶19.)

Perkins talked to Dinan for several seconds, and Dinan, who the deputies described as loud,

upset, and agitated, threw his papers to the ground.  (Perkins Decl., ¶10); (Vetter Decl., ¶19);

(Hallway Video, at 2:24-2:36.)

After about a minute of additional discussion, Dinan agreed to leave the courthouse and

Perkins and Vetter escorted him to the front desk, where they exchanged information.  (Perkins,

Decl., ¶10); (Vetter Decl., ¶20.)  No deputy gave Dinan an exclusion order since Dinan had

calmed down by that time.  *Id.*  Although Vetter told Dinan that he was not to return the

courthouse that day, Dinan returned to the courthouse about five to 10 minutes later, without

incident, to pay another ticket for a parking and registration violation that he received while he

was inside the courthouse.  (Dinan Dep., at 88:3-9); (Dinan Decl., ¶15.)

//

---

[4] Dinan had previously had fusions of the neck and lower back, brain surgery, and
radiation therapy to his throat, and was afraid that because of his prior medical issues, he would
suffer a life-threatening injury when he was slammed against the wall. (Dinan Decl., ¶16.) As a
result of this incident, Dinan states that he suffered headaches, neck aches, increased tinnitus,
pain radiating down his arm, a bump on the back of his head, and emotional distress. (Dinan
Decl., ¶16.)

OPINION AND ORDER- Page 8

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## DISCUSSION

Dinan alleges Section 1983 claims under the Fourth and First Amendments, as well as common law claims for assault and battery, and false imprisonment. To establish a claim under Section 1983, a plaintiff must prove that: "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a constitutional right." *L.W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992). State officials or municipalities are liable for deprivations of life, liberty, or property that rise to the level of a "constitutional tort" under the Due Process Clause of the Fourteenth Amendment. *Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007).

I.       **Section 1983 – Fourth Amendment**

Dinan's Fourth Amendment claim really consists of two separate claims– one for an

unreasonable seizure, and one for an unreasonable use of force attendant to that seizure.  (Fourth

Amend. Compl., #29, ¶¶29-31); U.S. Const. amend. IV (the Fourth Amendment guarantees

"[t]he right of the people to be secure in their persons ... against unreasonable searches and

seizures").  While I find that Dinan's Fourth Amendment seizure claim fails as a matter of law,

Dinan's Fourth Amendment unreasonable force claim should be submitted to a jury.

A.       **Seizure**

There are two distinct questions raised by Dinan's Fourth Amendment seizure claim–

whether he was seized at all and whether that seizure was unreasonable.  *See* U.S. Const. amend.

IV (prohibiting only "unreasonable . . . seizures"); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599

(1989) ("Seizure alone is not enough for § 1983 liability;  the seizure must be unreasonable.")

Because the law in the Ninth Circuit is unsettled concerning whether the deputies even seized

Dinan, qualified immunity bars Dinan's seizure claim.

Dinan alleges and argues that Vetter seized Dinan for purposes of the Fourth Amendment

when he placed his hand on Dinan's shoulder and prevented him from turning toward Room 106

after Dinan left the courtroom.  Defendants, however, argue that excluding Dinan from the

courthouse did not amount to a Fourth Amendment seizure because Dinan was free to go

anywhere else he chose, except for remaining inside.

In general, a person is "seized" within the meaning of the Fourth Amendment when "by

means of physical force or show of authority, his freedom of movement is restrained." *United*

*States v. Smith*, 633 F.3d 889, 892 (9th Cir. 2011) (quoting *United States v. Mendenhall*, 446

OPINION AND ORDER- Page 10

U.S. 544, 553 (1980)).  Thus, courts consider a person to be seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554 (holding that no seizure occurred when unarmed and ununiformed DEA agents approached plaintiff in an airport concourse and asked to see her identification and airline ticket).

However, after establishing the *Mendenhall* "free to leave" test, the United States Supreme Court decided *Florida v. Bostick*, in which it refined the definition of Fourth Amendment seizure to account for encounters where the individual does not wish to leave the scene of his encounter with police. *Bostick*, 501 U.S. 429 (1991).  In *Bostick*, a case where the police asked to search the luggage of a traveler aboard a bus, the Court announced:

> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

501 U.S. at 439.  The *Bostick* decision has prompted the Sixth Circuit to observe that a seizure occurs when a reasonable person would not feel free to remain somewhere, by virtue of some official action. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005) (citing *Bostick*, 501 U.S. at 439, and holding that plaintiff's claim "that the officers ordered him to walk his bicycle out of Eastpointe back to Detroit, and then 'escorted' him there," alleged a seizure). However, the Second Circuit takes the opposite approach, applying the *Mendenhall* test without acknowledging *Bostick*, and holding that a court officer's removal of a law clerk from the courthouse after the clerk was fired was not a seizure because the clerk was free to go anywhere except the courthouse. *See Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994)  Other

OPINION AND ORDER- Page 11

circuits have either mixed or ambiguous jurisprudence on the issue of whether an order to leave a particular public place qualifies as a seizure. *See* Henderson, *"Move On" Orders as Fourth Amendment Seizures*, 2008 B.Y.U. L. Rev.1, 24-30. Recent commentary sides with the Second Circuit, arguing that the Fourth Amendment is not the proper jurisprudential vehicle to address expulsions from public areas. *Id.* at 45 (concluding that "throughout the nation's history the Fourth Amendment law of seizures has regulated detentions, and there does not seem to be any pressing need for it to also cover the expulsion of a person from a location in which he or she has no property interest."). Most importantly, courts in the Ninth Circuit have not addressed the issue, with the exception of one unpublished district court case that applies the *Mendenhall* test with little additional analysis. *See Tajalle v. City of Seattle*, No. C07-1509Z, 2008 WL 630061, at *4 (W.D. Wash. Mar. 7, 2008) (holding that plaintiff who claimed officers attempted to remove him from a public library through threats of force and violence did not allege facts supporting a finding that he had been seized). I am more persuaded by the Sixth Circuit's approach than the Second Circuit's, particularly because the Second Circuit failed to appreciate that the Supreme Court refined its Fourth Amendment seizure jurisprudence in *Bostick* and its progeny. However, my resolution of this claim does not depend on adopting the Sixth Circuit's jurisprudence, because I still grant defendant's motion for summary judgment on Dinan's seizure claim under the doctrine of qualified immunity.

To determine whether qualified immunity bars a plaintiff's suit, courts ordinarily employ the sequential analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). First, the court determines whether the facts alleged by plaintiff, taken in the light most favorable to plaintiff, establish a constitutional violation. *Id.* at 201. If no constitutional right would have been

violated under the facts alleged, the analysis ends. *Id.* If a violation could be established under the facts alleged, the court then considers whether the right allegedly violated was clearly established. *Id.* For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). "The plaintiff bears the initial burden of proving that the right was clearly established." *Sweaney v. Ada Cnty., Idaho*, 119 F.3d 1385, 1388 (9th Cir. 1997). Courts, however, can "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Unlike individuals, municipalities cannot assert qualified or absolute immunity from suit in Section 1983 litigation. *See Leatherman v. Tarrant County*, 507 U.S. 163 (1993).

I exercise my discretion to decide the second prong of the qualified immunity analysis first, and conclude that Dinan cannot establish that second prong. Given the discussion above about the various circuits' divergent seizure jurisprudence and the lack of clear authority in the Ninth Circuit, the law was not clearly established at the time of this incident that the deputies could effect a seizure merely by preventing an individual from remaining inside a public courthouse. Thus, even without addressing whether Vetter and Perkins' putative seizure of Dinan was constitutionally reasonable, I conclude that qualified immunity bars Dinan's Fourth Amendment seizure claim against Vetter. Accordingly, Vetter's motion for summary judgment on the seizure portion of the Fourth Amendment Section 1983 claim is granted and Dinan's motion on that portion of the claim is denied.

### B.    Use of Force

Dinan's other Fourth Amendment claim involves Vetter's alleged use of excessive force.

The seminal case concerning the constitutionality of an officer's use of force under the Fourth

Amendment is *Graham v. Connor*, 490 U.S. 386 (1989).  In *Graham*, the Supreme Court stated:

> Determining whether the force used to effect a particular seizure is reasonable under the
> Fourth Amendment requires a careful balancing of the nature and quality of the intrusion
> on the individual's Fourth Amendment interests against the countervailing governmental
> interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right
> to make an arrest or investigatory stop necessarily carries with it the right to use some
> degree of physical coercion or threat thereof to effect it. Because the test of
> reasonableness under the Fourth Amendment is not capable of precise definition or
> mechanical application, however, its proper application requires careful attention to the
> facts and circumstances of each particular case, including the severity of the crime at
> issue, whether the suspect poses an immediate threat to the safety of the officers or others,
> and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The reasonableness of a particular use of force must be judged from the perspective of a
> reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The
> calculus of reasonableness must embody allowance for the fact that police officers are
> often forced to make split-second judgments—in circumstances that are tense, uncertain,
> and rapidly evolving—about the amount of force that is necessary in a particular
> situation.
>
> As in other Fourth Amendment contexts, however, the reasonableness inquiry in an
> excessive force case is an objective one: the question is whether the officers' actions are
> objectively reasonable in light of the facts and circumstances confronting them, without
> regard to their underlying intent or motivation.

*Graham*, 490 U.S. at 396–397 (1989) (citations, internal quotation marks, and internal

modifications omitted).

Applying *Graham*, the Ninth Circuit performs a three-steep analysis for determining the

reasonableness of non-deadly force used to effect a seizure:

> First, we assess the gravity of the particular intrusion on Fourth Amendment interests by
> evaluating the type and amount of force inflicted . . . . Second, we assess the importance

of the government interests at stake by evaluating: (1) the severity of the crime at issue,
(2) whether the suspect posed an immediate threat to the safety of the officers or others,
and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by
flight . . . . Third, we balance the gravity of the intrusion on the individual against the
government's need for that intrusion to determine whether it was constitutionally
reasonable.

*Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). "Because questions of reasonableness

are not well-suited to precise legal determination, the propriety of a particular use of force is

generally an issue for the jury." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994); *see also*

*Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004) ("The need for balancing [between the

amount of force applied and the need for that force] means that summary judgment . . . in

excessive force cases should be granted sparingly.")

### 1.    Amount of Force Used

The parties use different words to describe the force Vetter used against Dinan.

Defendants call it "more forceful than a hand on the back, [but still] a low intrusion upon

Plaintiff's interest," especially given the lack of medical evidence of injury to Dinan. (Def.'s Br.,

#33, at 12-13.) Dinan succinctly asserts that "Dinan was slammed against the wall." (P.'s Br.,

#44, at 17.)  But since the video recording captures Vetter's conduct, there can be little factual

dispute concerning the amount of force Vetter applied.  The video shows Vetter thrusting his

hands aggressively into Dinan's chest, slamming Dinan into the door frame and door behind him,

and then using both hands to grasp Dinan's coat, and pulling him away from the wall.  While this

shove was not as severe as some other forms of law enforcement intervention that might have

been employed, such as a baton strike or a taser stun, it was more than a minimal application of

force.  This factor does not require any factfinding and weighs in favor of finding that force used

was unreasonable.

Defendants argue that because Dinan has not presented any medical evidence of his alleged injuries, the court should find Vetter's use of force was minimal. While the presence of injuries is relevant to evaluating the degree of Fourth Amendment intrusion, force can still be found unreasonable even without causing injury. *See Bryan v. MacPherson*, 630 F.3d 805, 824–825 (9th Cir. 2010). In the case relied upon by defendants, the Ninth Circuit cited the lack of medical evidence substantiating plaintiff's alleged injury in concluding that the force used by an officer was reasonable. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("Arpin's claim of injury is equally unsupported as she does not provide any medical records to support her claim that she suffered injury as a result of being handcuffed) (citing *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990)). But that reasoning is not particularly relevant here. In *Arpin*, the Court found the lack of demonstrated physical injury to be important because it undermined plaintiff's "conclusory allegations" and supported the officer's undisputed report, which indicated that he handcuffed the plaintiff "without injury." *See* 261 F.3d at 921-922. By contrast, the video in this case leaves no room for speculation about the amount of force applied, and therefore the court need not rely on the existence of medically proven injury as a proxy for determining the credibility of the officer's characterization of that force. Thus, the lack of medical evidence of injury has little impact on the *Graham* reasonableness inquiry in this particular case.

## 2. Need for Force

To determine the government's interest, I examine: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3)

whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *See Miller*, 340 F.3d at 964.

### a.    Severity of Crime at Issue

Defendants contend that two crimes were at issue immediately preceding Vetter's use of force – criminal trespass in the second degree (Or. Rev. Stat. § 164.245(1)) for Dinan's failure to follow Vetter's alleged order to leave the courthouse, and interference with a peace officer (Or. Rev. Stat. § 162.247) for Dinan's brushing off of Vetter's arm.   Plaintiff contends that no crimes were at issue, because Dinan's response to Vetter was never charged as an assault and does not constitute an independent ground for arrest because it was responsive to an illegal seizure.

The key event for this analysis is Dinan's push of Vetter's arm, which triggered Vetter to shove Dinan.   The question, then, is whether that push gave Vetter reasonable suspicion or probable cause to believe that Dinan had committed a crime, and if so, the severity of that crime. In Oregon, interference with a peace officer is a Class A misdemeanor.   Or. Rev. Stat. § 162.247. That offense requires that a person either: "(a) Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer or parole and probation officer from performing the lawful duties of the officer with regards to another person; or (b) Refuses to obey a lawful order by the peace officer or parole and probation officer." Or. Rev. Stat. § 162.247(1.)  Subsection (a) would not have applied to this case, since the deputies were engaged with Dinan, not "another person," when Dinan brushed off Vetter's arm.   Further, subsection (b) implicates the same factual issue I discussed above, because the parties dispute whether Vetter or Perkins issued a lawful order, and therefore, whether Dinan resisted such an order.   Because the applicability of Or. Rev. Stat. § 162.247 turns on a fundamental factual disagreement in this case, it is uncertain whether any

OPINION AND ORDER- Page 17

crimes were truly "at issue" in the encounter between Dinan and Vetter. Even if interference

with a peace office was a crime at issue, it is a relatively minor offense.

Defendants also insist more generally that Dinan unquestionably committed a "serious

and threatening criminal act" by pushing away Vetter's arm. But, again, that is far from clear.

Oregon law concerning justification defenses to criminal acts prohibits individuals from using

"physical force to resist an arrest by a peace officer who is known or reasonably appears to be a

peace officer, whether the arrest is lawful or unlawful." Or. Rev. Stat. § 161.260; *cf. Oregon v.*

*Crane*, 46 Or. App. 547, 552, 612 P.2d 735, 738 (1980), *abrogated on other grounds by Oregon*

*v. Wright*, 310 Or. 430, 433, 799 P.2d 642 (1990) (acknowledging that "the right to resist even an

unlawful arrest made under color of law is only partially abrogated. Only the use or the

threatened use of violence or physical force which creates a substantial risk of physical injury is

prohibited; neither flight to avoid arrest nor passive resistance have been made crimes."). I note

that it is also a crime to resist arrest. *See* Or. Rev. Stat. § 162.315. But arrest has a very specific

definition under Oregon law: either placing a person under actual or constructive restraint, or

taking a person into custody, for the purpose of charging that person with an offense. Or. Rev.

Stat. § 133.005(1); *State v. Pierce*, 226 Or. App. 224, 229, 203 P.3d 290 (2009). It is undisputed

that Vetter was not arresting Dinan when he placed his hand on Dinan's shoulder– Vetter did not

believe that Dinan's conduct was criminal and did not restrain him in order to charge him with

any offense. Thus Or. Rev. Stat. § 161.260 and Or. Rev. Stat. § 162.315, both of which pertain

to resistance to an "arrest," are inapplicable here.[5] In sum, the fact that analysis of this subfactor

---

[5] Defendants also contend that Ninth Circuit authority prohibited Dinan from brushing off
Vetter's arm, even if Vetter lacked probable cause to arrest Dinan. *See Arpin*, 261 F.3d at 922
(9th Cir. 2001) (observing, without citation, that arrestee's conduct of "stiffening her arm and

requires resolution of factual disputes and the relatively minor nature of the crime at issue militate against summary judgment for either party.

      **b.**      **Immediate Threat to Safety of Officers or Others**

      The Ninth Circuit considers the second subfactor to be the most important in determining the government's interest in using force. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc).   Unfortunately, factual disputes also surround this inquiry.  To demonstrate why that is so, I briefly review the relevant undisputed facts: either the courtroom clerk or the judge asked a deputy to be present in the courtroom after Dinan arrived; Deputy Vetter arrived, knowing that Dinan was potentially disruptive; Deputy Vetter watched from the back of the courtroom as Dinan tried to speak with the Judge without having a matter on calender; Dinan raised his voice and appeared upset and angry when the Judge refused to speak with him; the courtroom clerk asked Dinan to leave the courtroom; Dinan complied, gathering his personal items and walking towards the door;  Dinan had a brief conversation at the door with Vetter; after walking out of the door, Dinan turned toward Room 106, and Vetter and Perkins tried to guide him in the opposite direction; Vetter placed his hand on Dinan's shoulder and Vetter perceived that Dinan's body was tense; in response, Dinan pushed Vetter's arm away while stepping away from Vetter, but still remained within a few feet of Vetter; Vetter then shoved Dinan into the wall.

      On these undisputed facts alone I cannot conclusively find that Dinan posed an immediate threat of safety to Vetter or Perkins.  On the one hand, Dinan's raising his voice in the courtroom,

---

attempting to pull it away" when an officer attempted to handcuff her, "was impermissible," regardless of whether the officer had probable cause to arrest her).  But *Arpin* implicitly endorses the same rule as Or. Rev. Stat. § 161.260, that resistance to an unlawful arrest is not permitted.

tense body, resistance to Vetter's hand being placed on Dinan's shoulder, and physical proximity to Vetter objectively created the potential for some safety risk to Vetter. On the other hand, the degree and immediacy of such a potential threat was far from certain. Dinan was trying to disengage with the deputies by walking towards Room 106, Dinan pushed away Vetter's arm only after Vetter touched him first, Dinan did not verbally threaten either Vetter or Perkins, and Dinan backed away from Vetter rather than move toward him. Additionally, several key factual disputes remain concerning the context of Dinan's behavior, namely whether he was previously arguing with Vetter and whether he was resisting a verbal order by Vetter and Perkins to leave the courthouse. While Dinan's undisputed behavior objectively would have led an officer to be wary, a "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *See* Bryan, 630 F.3d at 826 (internal citation and quotations omitted). Whether there were additional circumstances creating an immediate threat of safety and justifying Vetter's shove requires resolution of disputed factual questions, and is not amenable to summary judgment.

### c.     Actively Resisting Arrest or Evading Arrest by Flight

Defendants argue that Dinan actively resisted Vetter by pushing off his arm, while Dinan argues that because Vetter never arrested him, he did not "actively resist arrest" as contemplated by *Graham*. The frequently cited language from *Graham* focuses the court's attention on whether the plaintiff was "actively resisting *arrest* or attempting to evade *arrest* by flight," even though *Graham* announced that the same standard applies for evaluating the reasonableness of excessive force used in making an arrest, as well as an "investigatory stop, or other seizure of

OPINION AND ORDER- Page 20

[the] person." 490 U.S. at 388, 396 (emphasis added).  While I do not find any cases explicitly extending the "actively resisting" analysis to other non-arrest seizures governed by the Fourth Amendment, it makes much sense to do so, since the *Graham* standard should not be applied slavishly.  *See Bryan*, 630 F.3d at 826 (9th Cir. 2010) ("we examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*").  There is no doubt that brushing off a deputy's arm constitutes some level of resistance, and resistance that is more active than passive.  *See Bryan*, 630 F.3d at 830 ("Resistance, however, should not be understood as a binary state, with resistance being either completely passive or active.  Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer.")  At the same time, it was much milder than other forms of active resistance that could come under the rubric of "struggling with an officer," such as brandishing a weapon, advancing on the officer, or fighting with the officer.  *Id.*  Overall this subfactor, unlike the first and second, requires no resolution of factual disputes and militates in favor of a finding that Vetter's force was reasonable.

### 3.    Balancing Force Used Against Need for Force

In light of the foregoing analysis, the court recognizes that the balancing task articulated by *Graham* must be completed by a jury in this case.  First, several unresolved factual questions are crucial to evaluating the first and second subfactors in assessing the government's interest.  But even setting aside those disputes and evaluating only the undisputed facts, which is effectively what the court must do on cross-motions for summary judgment, a jury question remains.  I cannot conclude as a matter of law that Vetter's shove was unreasonable in light of

OPINION AND ORDER- Page 21

Dinan prior disruptive behavior, his brush-off Vetter's arm, and his proximity to both deputies; neither can I say conclusively that Vetter's conduct was reasonable, given the forcefulness of the shove into the hallway wall. Because the reasonableness inquiry here is "not well-suited to precise legal determination," both summary judgment motions on the excessive force claim are denied. *See Chew*, 27 F.3d at 1440.

### C.    Qualified Immunity

As the Supreme Court made clear in *Saucier*, the determination of whether an officer is entitled to qualified immunity for the use of excessive force is distinct from the inquiry on the merits of the plaintiff's excessive force claim. It is clear that the first *Saucier* prong is satisfied. The facts taken in the light most favorable to Dinan indicate that Vetter violated his Fourth Amendment right to be free from excessive force. 533 U.S. at 201-202. As for the second *Saucier* prong, I find that the law regarding excessive force for a law enforcement officer was clearly established at the time of this incident by *Graham* and its progeny in the Ninth Circuit, setting forth a multi-factor, totality of the circumstances test to determine the reasonableness of the force used. Defendants insist that because no case had ever applied those standards in the particular factual scenario faced by Vetter, the law was not clearly established. But, of course, courts do not require that level of specificity. *See Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) ("To determine that the law was clearly established, we need not look to a case with identical or even materially similar facts"). Taking the facts in the light most favorable to Dinan, as I must on Defendants' summary judgment motion, no reasonable officer could have understood that forcefully shoving Dinan into a door and doorframe was a reasonable response to Dinan's attempt to continue on his way to Room 106 by brushing off Vetter's arm, given that no

OPINION AND ORDER- Page 22

one had previously instructed Dinan that he was not free to go to Room 106 and needed to exit the courthouse.

## II.    Section 1983- First Amendment

Dinan's complaint alleges that he engaged in speech protected by the First Amendment when he accessed the court, spoke with Judge Larsen, and spoke to Vetter as he left the courtroom, and contends that Vetter ordered him to leave the courthouse, seized him, and slammed him against a wall because of that speech.  (Fourth Amend. Compl., #29, ¶¶34-37.) Defendants alone move for summary judgment on Dinan's First Amendment § 1983 claim.

To demonstrate retaliation in violation of the First Amendment, a plaintiff must prove two elements: (1) "defendants took action that would chill or silence a person of ordinary firmness from future First Amendment activities;" and (2) "defendants' desire to cause the chilling effect was a but-for cause of defendants' action." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900–901 (9th Cir. 2008).   It is fairly clear– and apparently not disputed by defendants– that Vetter's conduct in this case would chill an ordinary person's future exercise of First Amendment activities.  The main dispute, then, is whether Vetter acted as he did because of a desire to chill Dinan's future exercise of free speech, or for a different and legitimate law enforcement reason.

Dinan now argues that Vetter seized and shoved Dinan because Dinan attempted to speak with a judge and when rebuffed, uttered the word "Jesus" as he turned away from the bench, which Vetter found to be personally offensive.  (Vetter Decl., ¶23.)  Additionally, Dinan seems to argue that Vetter's conduct must have been retaliation for that speech because Vetter lacked any legitimate law enforcement reason for his interaction with Dinan.  By contrast, defendants argue

that Vetter sought to enforce constitutionally valid regulations governing speech in the county

courthouse, not to retaliate against Vetter for protected speech activities.

Because a county courthouse is a non-public forum, the county may regulate and restrict

speech inside it as long as the regulations are reasonable in light of the forum's purpose and are

viewpoint neutral. *Sammartano v. First Judicial Dist. Court, in & for Cnty. of Carson City*, 303

F.3d 959, 965-966 (9th Cir. 2002); *but see Greenwood v. Tillamook Cnty.*, No. 05-CV-58-BR,

2006 WL 2551594, at *3 (D. Or. Aug. 30, 2006) (denying summary judgment on First

Amendment retaliation claim because the record was not sufficiently developed to determine

whether county courthouse was a public or non-public forum).  Multnomah County has enacted

such regulations, which permit ejecting an individual from the court when that individual

attempts to intimidate court staff or other members of the public or interferes with or interrupts a

Court proceeding, among other grounds.  *See* Multnomah County Supplemental Local Rule

6.055(4),(5), *available at*

http://courts.oregon.gov/Multnomah/Rules_and_Fees/Court_Rules/pages/Court_Rules.aspx (last

visited Jan. 9, 2012).  Defendants argues that Vetter was enforcing this rule when he ordered

Dinan to leave the courthouse.  Although Vetter does not refer to this local rule in his

declaration, he does state that he asked Dinan to leave because Dinan was being loud, aggressive,

and disruptive toward Judge Larsen and the courtroom clerk, and insists that Dinan's utterance of

the word "Jesus" played no part in his decision to remove Dinan.  (Vetter Decl., #41, ¶¶ 9-10,

23.)

Even taking facts in the light most favorable to Dinan, on defendants' motion for

summary judgment, no reasonable jury could find that Vetter acted as he did because of a desire

to chill Dinan's exercise of free speech.  Dinan offers no evidence to contradict Vetter's declaration that he sought to remove Dinan from the courthouse by guiding him towards the exit because of his disruptive behavior, which is permitted by the reasonable courthouse regulations adopted by Multnomah County, and not because of Dinan's reference to "Jesus" in the courtroom.   Likewise, Dinan presents no evidence that Vetter shoved him because of any of Dinan's other expressive activity.  The video is clear that Vetter used physical force against Dinan in direct response to Dinan brushing off Vetter's arm– and Dinan does not contend that his removal of Vetter's arm qualifies as expressive activity protected by the First Amendment. Finally, Dinan's retaliation claim rests on the unsubstantiated assumption that Vetter had "no legitimate law enforcement reason" to ask Dinan to leave the courthouse.  While the law is unsettled in this circuit about whether guiding Dinan out of the courthouse qualifies as a seizure under the Fourth Amendment, and a factual dispute remains over whether any deputy actually ordered Dinan to leave before blocking his path to Room 106, it is clear that both local court rules and Sheriff's Department policies permitted the deputies to intervene in response to Dinan's behavior in the courtroom.  Since no First Amendment violation occurred as a matter of law, there is no need to engage in a qualified immunity analysis.  Defendants' motion for summary judgment on this claim is granted.

## III.    Assault and Battery

Defendants similarly move for summary judgment against Dinan's common law assault and battery claim.  Assault and battery claims do not lie against police officers for the use of "physical violence . . . no more than reasonably necessary to accomplish the legitimate purpose of fulfilling their duty." *Gigler v. Klamath Falls*, 21 Or. App. 753, 763, 537 P.2d 121 (1975).

Oregon's standard for assault and battery aligns with the federal constitutional standard for unreasonable force. *See Woods v. Gutierrez*, No. 3:11–CV–01082–BR, 2012 WL 6203170, at *11 (D. Or. Dec. 12, 2012) (granting officers' motion for summary judgment on assault and battery claim because court had already concluded that the force used against plaintiff was not excessive under the Fourth Amendment); *Sandau v. Wood*, No. CV 07–0632–PK, 2009 WL 3429751, at *23 (D. Or. Oct. 19, 2009) (same); *cf. Saman v. Robbins*, 173 F.3d 1150, 1157, 1157 n. 6 (9th Cir. 1999) (if Section 1983 claim premised on excessive force fails, battery claim under California common law arising out of the same facts must also fail). Here, I already determined that a question of fact remains over whether Vetter' use of force was constitutionally reasonable under the *Graham* factors. Accordingly, the same factual disputes preclude summary judgment against Dinan's assault and battery claims under the *Gigler* standard.

## IV.    False Imprisonment

Defendants also move for summary judgment against Dinan's false imprisonment claim, in which Dinan alleges that Vetter unlawfully restrained his freedom of movement. (Fourth Amend. Compl., #29 ¶¶47-50.) Under Oregon law, false imprisonment is "the unlawful imposition of restraint on another's freedom of movement." *Walker v. City of Portland*, 71 Or. App. 693, 697, 693 P.2d 1349 (1985). Such restraint may be accomplished by actual or apparent physical barriers, compulsive physical force, a threat to apply physical force, or assertion of legal authority. *Gaffney v. Payless Drug Stores*, 261 Or. 148, 492 P.2d 474 (1972). The restraint may be brief. *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353, 378 P.2d 717 (1963). The tort of false imprisonment therefore requires proof of four elements: 1) the defendant confined the plaintiff; 2) the defendant intended the act to cause the confinement; 3) the plaintiff was aware of the

OPINION AND ORDER- Page 26

confinement; and 4) the confinement was unlawful. *See Ross v. City of Eugene*, 151 Or. App. 656, 663, 950 P.2d 372 (1997). These elements constitute factual issues that are generally decided by the trier of fact. *Id.*

Defendants argue that Dinan cannot establish that his freedom of movement was unlawfully restrained, since Vetter never physically restrained Dinan before Dinan "struck" Vetter, and Vetter's subsequent responses to that act were lawful. Even assuming Vetter did not physically restrain Dinan by merely directing him away from Room 106, a question of fact remains concerning the lawfulness of Vetter's subsequent conduct. Whether Vetter's shove and grabbing of Dinan's jacket was lawful turns on the reasonableness of Vetter's use of force under Fourth Amendment jurisprudence. And, as explained above, the reasonableness of Vetter's force is a jury question. Because defendants' arguments in favor of summary judgment on Dinan's false imprisonment claim prematurely assume the legality of Vetter's conduct, Defendants' motion on this claim is denied.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment (#32) is granted in favor of defendants on Dinan's Section 1983 Fourth Amendment seizure claim and First Amendment retaliation claim, but denied on Dinan's Fourth Amendment excessive force, common law assault/battery, and common law false imprisonment claims. Dinan's motion for partial summary judgment (#43) is denied with respect to all of his claims, but granted as to defendants' assertions of qualified immunity, with the exception of Vetter's assertion of qualified immunity on Dinan's Fourth Amendment seizure claim, which is proper.

IT IS SO ORDERED.

Dated this 28th  day of January, 2013.

Honorable Paul Papak
United States Magistrate Judge

OPINION AND ORDER- Page 28